Good morning, your honors. I'd like to reserve three minutes for rebuttal. All right, watch the clock then. Thank you, your honor. My name is Frank Grantell. I represent Mr. Sisco, who's been sentenced to prison for the rest of his life for a murder he did not commit. I'd like to acknowledge the fact that my client's family has traveled up here from about 40 miles south of Fresno. His grandmother, two brothers, several nephews, and his two children, his aunt, are all present in the courtroom today. This case involves some of the most fundamental rights a defendant has in a trial, the right to effective assistance to counsel and to confront and to confront. The question that this court must decide, I believe, the most important question, is whether Mr. Sisco's effective assistance or confrontational clause rights as guaranteed under the Sixth Amendment were violated by the failure of trial counsel to cross-examine the what it takes, what is good trial strategy, how to win a case. And in my first 25 years of law practice, I learned one important lesson, and that is you cannot win the case on your expert because the jury's going to say he's bought and is to get a concession from the expert that the prosecution or the opposition calls as their witness. And in this case, trial counsel failed to do that. Now, that's one way to look at it, I suppose, but we don't see this witness. And I assume in your 25 years of trial practice, you learned, as I did, that you adjust your approach depending on the witness. In other words, you don't have general rules on how to examine any witness, expert or not. And here, Mr. Bevel, who was a central part of the case against your client, gives a question on the blood on the toe and gives an answer. How is it there wouldn't be any blood there on the toe? Answer, if you're kicking even multiple times with the actual toe and the stains are up on top of the remainder of the shoe and to the side, those areas are not coming in contact. The toe is right now. That's not much of an answer. Well, let me just. We don't know how good a witness this guy was to look at. No. And why don't you assume? Because we're not supposed to second guess counsel. We don't second guess you when you're defending. So we're not second guessing here. I'm not. That's exactly what you know. No, we're not. So you don't know what this guy looked like to cross examine. And so you sit here and you've got a meaningless answer from this expert and you have your own experts sitting in the wings. Are you going to give this guy a chance to come up with an absolutely perfect answer to that question? No, no, that's not the point I'm trying to make here, Your Honor. This expert testified that my client kicked this man and there's only blood spatters. Now, the physical evidence doesn't support that opinion. And that's where counsel messed up the physical evidence. If he would have kicked this man, there would have been smears on that right boot and not just spatters. And trial counsel didn't nail him down. That may be that he looked at that witness and thought that's as good as I'm going to do. No, no. The physical evidence contradicted the conclusion reached by a great argument. Well, no, no. You don't get the expert to agree by on cross examination. You've absolutely weakened that argument. Well, you ask him, you nail him on it. He didn't nail him. He didn't pursue it. He should have asked him. Look, isn't that classic second guessing where he's where this lawyer has it, where the defense lawyer has an expert sitting in the wings. You've got your own opinion about whether you can win a case with a defense expert. And I might say that's not universally agreed on among defense lawyers. And the lawyer says, I've watched this witness and I'm going to get a whole bunch more hokey stuff from this guy. I'll leave it the way it is. I've got a meaningless answer and I'll have my expert cover it. Why is that perfectly a good trial strategy? No, it is not, Your Honor. Why isn't it? Because, first of all, if you look at Strickland versus Washington at 690, it talks about what we do when we evaluate this. We have to look at the circumstances at the time. In the light of the circumstance at that time. Now, the physical evidence contradicts the opinion. He should have cross-examined him, and he didn't. Because if you would have cross-examined him, he would have got a concession out of him. And that's not speculation. The physical evidence did not support his conclusion. And what answer would he have gotten had he cross-examined? I would have asked him, wouldn't there be blood smears on the right foot if he kicked him with the right foot? That's what the question he asked. No, that's not. And he didn't get an answer. He got not necessarily. And then he gets the hokey answer I read to him. Right. And he should have asked him again. Or he should have objected. That's non-responsive. I want to then ask him again. That wouldn't have been his objection, right? What, Your Honor? Wouldn't have been his question. Or rephrase. Then I'd ask the question again. Do we know what this, the state's expert would have said if pressed in the way you suggest it should have been? There's only one answer he could give unless he wants to lie. His opinion's wrong. Because there is no smear on the right boot. Spatters don't mean you come in contact. If this guy was a bloody mess, he was beat to a pulp by Mr. Grigorich. And if my client kicked him, there would have been blood smears on his foot. Didn't, you want to tell? Didn't your client make an admission to the police? It's, he denied making the admission. And there's a lot of different witnesses here. In fact, two of the most closest witnesses said my client didn't touch him. And then there was, there was a. Wasn't there some law enforcement testimony that he said? Yes, there was. What would happen if I accidentally kicked him? Right. That's that. And he denied making that statement. He denied kicking him. There was, that's true. There was that evidence. And the jury heard that evidence. Of course. But this is a close case. You know, here is the most important witness, the most critical witness, the witness that the government relied on heavily as a court of appeal found, as everyone concedes. This is a witness that really needed to be cross-examined and counsel didn't do it. Now, granted, we can't see the man. That's not the question. Counsel argue to the jury the point that you're making here about the blood spatters? I don't believe he did, Your Honor. Unless he did it through his expert. That's not enough. In closing argument, did he make that point? He had. I don't think he did. I don't think he had. He did it through his expert, but he didn't do it. I'm not asking about questions and answers. I'm asking about argument. He didn't touch Bevel's argument. He didn't touch Bevel's testimony directly. In other words, he didn't attack Bevel in his closing argument. He had his witness. And the point of the whole story is, you know, when you need to get the point of confrontation here is to test the opinion of this expert. That's what confrontation is about. That's what effective assistance of counsel is about. Test the opinion. Trial counsel didn't. Therefore, my client did not have a fair trial. He did not have his full rights of confrontation. And this is the most critical witness. Were there any witnesses who testified at trial who actually saw your client kick the victim? There's one witness that claims that he kicked him, and that's Ms. Stark, who's also claimed Mr. Gregorich didn't do anything. So her testimony is not credible. Terry heard that testimony? Yes. But what your client was convicted of second degree murder? Yes, Your Honor. Could he have been convicted of second degree murder if he'd kicked another part of the victim's body and thus not had the blood smears? I don't know how he could. I don't know how he could, Your Honor. I don't believe he could. That's the question. Who did this here? My guy's just standing there. Just being there is not enough. He's just standing there. I mean, that's his defense. Two of the main witnesses said he's there in close proximity and didn't do anything. But at least one witness testified that he, in fact, kicked the victim. And that one witness was the lady who said Mr. Gregorich didn't do anything. And we all know he's the one that punched this guy and beat him to a pulp and kicked him in the head. And when he did, there was a solemn sound. I'm interested in hearing your arguments on the jury instructions. Perhaps we can move to that. Okay, Your Honor. And specifically on the implied malice instruction? Well, on the acquittal first. That shifts the burden of proof. There's no doubt about it. Was an alternate instruction requested? What, Your Honor? Was an alternate instruction requested by the defense? No. No instruction. That was the instruction given. There was Ninth Circuit authority at the time that, about alternative instructions and requesting them. Jackson, I think, is the case. I'm not familiar. You're talking about United States versus Jackson? Yeah. Yeah. That's the case I cited in my argument. Yeah. There was no instructions requested. There was no objections made. And my claim is ineffective assistance not to object. Jackson doesn't say it's always okay to give this. It says that, you know, if you if there's a choice and the defense attorney requests the lesser one, then that's the appropriate way to go. That makes that's different than my case. I would agree with that. But the point of the instruction is it placed the burden on my client to prove himself innocent before they can even consider a lesser charge. And I think that shifts the burden. I also think the implied malice instruction, the state of California, the Supreme Court of California has just murdered the clear legislative intent that this has to be an act of wanton disregard, not just disregard. Wanton is a pretty nasty term. But the Supreme Court of California and Watson and several other cases have eliminated that term. Benito, I think that's wrong. It's not for the court to do that. And therefore, I think there's this is an unlawful enlargement. But I don't even think the court has to go. Let me just interrupt you right there. That the Dillinger case and others, that law has been the law of California for many years. Are we bound by the substantive interpretation of that state law by what the California Supreme Court says is the law in that area? That's true, Your Honor. But the Supreme Court of California has also violated their own constitution and our constitution by an unlawful enlargement of the statute. And that's my argument. Yes, you're bound by what they say. But if what they say violates the clear legislative intent, then they've unlawfully enlarged the statute. And that's my client had a liberty interest in the Constitution of California that the legislature makes the law, not the court. Any further questions, Your Honor? No, thank you. Thank you, Your Honor. May it please the Court. Maureen Daly, appearing on behalf of the Respondent. I'd like to start by noting that the right of confrontation was not, with respect to the ineffective assistance of counsel issue, was not made by the Supreme Court. What was mentioned in the COA was not briefed or addressed by the parties and is not technically before this Court. But the ineffective assistance of counsel issue, of course, is before the Court. And with respect to that claim, Captain Bevel's testimony was extremely damaging to Petitioner's case, and that's why I've included it in our excerpts of record in its entirety. I hope the Court will take note of that. Defense counsel could have concluded that pressing that witness on that particular question might not have been helpful in several particular ways. And I can name, I think, Judge Silley, that you asked what answer would we have gotten if he'd asked that expert that question. And there are four possible answers that we might have gotten. On direct examination, Bevel testified that some of the stains on the Petitioner's right shoe were still there, but that some had disappeared over time. He said that blood stains can disappear through aging and handling and flaking, and some of it just simply falls off, resulting in disappearance of some of the blood evidence. That's at RT 390. He also testified that laboratories, that's number one. Number two, he also testified that laboratories doing testing scrape off or cut off some of the blood. That's number two. Number three, he also was asked during direct examination why there weren't more stains on Petitioner's right boot. And he explained that when a strike from the boot, from the blood, when the strike goes forward, some of the blood goes upward and out of the way of the toe itself. And so a lot of the blood simply comes straight down and looks like it's coming from a 90-degree angle. And then he gave another quite compelling reason, and this is at RT 396. He said that dust and dirt that's already on the toe of the boot is not very conducive to actually sticking to the actual stain. So these are some compelling logical explanations and some tactical reasons. Counsel might not have wanted to pursue that particular question. And in fact, Bevel's testimony was extremely damaging. He said that there were over 70 medium-velocity impact blood spatters on Petitioner's right boot, and that the stains were consistent in directionality, location, and appearance with the footwearer using that boot to kick a blood-covered source. And also the pattern on his pants, mostly blood from the knee down, was consistent with the right leg being used to kick and the left leg being stationary while the right leg was used to kick. He testified in quite a bit of detail about the shirt, also the Petitioner's shirt, being consistent with the wearer having used his fist to strike the blood-covered source. So I think it's reasonable that defense counsel might not have wanted to press this particular witness. He'd done quite a bit of damage. And in particular, the defense expert was quite a strong witness for the defense. And he testified that in his opinion, if a person were to kick a blood-covered source even once, he would expect, and these are his words, I think it would be obligatory that there would be a smear of blood on the toe. So Dr. Thornton, the defense expert, testified that this was a flaw in Bevel's conclusion, and he described Bevel's work in the case as reckless. That's also in the SER at tab 7. So in addition, the eyewitness testimony strongly indicated that the Petitioner had in fact kicked the victim. And I'd like to review this since I believe that my colleague has kind of minimized the evidence against his client. Claire Stark did testify that she actually saw the Petitioner strike the victim. Her testimony was credible. She was only 12 feet away, and she was a completely unbiased spectator. And she did say that Gregorich didn't kick or that she didn't see him, but she also testified that she remembered that he was there. She wasn't sure if he was kicking because she was not in a position to see him. He wasn't in her direct sight. This beating incident apparently was between two vehicles in a parking lot, so people's vision of it was somewhat obscured. Also, Stark left before the fight was over to call 911, so she didn't see the whole thing. Several other witnesses provided strong testimony from which it could be reasonably inferred that the Petitioner kicked the victim. And the FNRs by the district court, which adopt the district court, the Fifth District Court of Appeals factual statement, also relayed a pretty good factual scenario of what the witnesses stated, and it's a fairly strong factual summary. There are, to summarize, Stark said she actually saw the Petitioner kick McCaffey. Three witnesses testified they saw Petitioner make kicking motions even though their views were obstructed. That's Chad Servadio, Tito Garza, and Jose Sanchez. And most or all of these victims also heard the thuds that would go with these sounds. Five witnesses testified they didn't see the Petitioner do anything, but all of those witnesses said that they did not see the entire beating. Those witnesses were the ones that didn't see the whole beating, Manuel Sanchez, Gabriel Reyes, Gregorich, the co-defendant, Jesus Hernandez, Antonio Agueda, Rocky Rodriguez was the only witness who claimed he saw the whole fight and he saw Petitioner do nothing. But, in fact, he did testify that he turned his attention to Chad Servadio during the fight. So except for Petitioner, the witnesses either saw the Petitioner kick or make motions like he was kicking, or they didn't see the whole incident. So to say that the physical evidence contradicts the conclusion of Officer Bevel is just not true. And then three witnesses who saw the Petitioner make motions like they kicked, I've reviewed that in my brief. Petitioner's credibility was called into question when he was first pulled over by the officers and he said to someone else in the vehicle, I didn't see nothing, did you? But I want to call to the attention to the Court, and I believe I did include the statement in my brief that Petitioner made a statement to Officer Denchfield on June 14th that what would happen if I did accidentally kick him. I'm not sure that belongs in my brief, because if you read the opinion of the Court of Appeal, they found that admission of that statement was error, but they found it harmless. So I don't know if you want to consider that statement or not, but you might want to read their harmless error assessment around page 44 in the Court of Appeal's opinion. But I did want to call to your attention, I don't know if you want to consider that or not, in fairness to the Petitioner. And certainly if Petitioner was present and he kicked the victim and he contributed to his death, he would certainly be culpable for the second-degree murder of the victim. There's no question about that. I'm prepared to answer any questions the Court has on any of the other matters. I guess not. Thank you. Thank you, Your Honor. Briefly, this was a closed case, and this was a critical witness. There was really only one witness. That was Claire Stark, who, again, said Gregorich wasn't involved. The other three that identified, say my client kicked him, they told the police different stories. They told them first that he wasn't involved. And then there were two eyewitnesses that said my client didn't do it, and that was their testimony. So this was a closed case. This was a critical witness. And this is the reasons of, you know, Mr. Bevel from Oklahoma. I mean, do you think the State of California could afford their own expert? I just question why they bring somebody from Oklahoma. But smears are not going to disappear. Spatters might. So, I mean, Bevel's opinion was full of a lot of holes, but the main thing was the fact that there were no blood smears on that right boot. Now, trial counsel talked to his expert. He saw the flaw in Bevel's testimony. Why didn't he pursue it? His expert told him Bevel was wrong. Why didn't he pursue it? And because he didn't pursue it, my client didn't get a fair trial. And the Sixth Amendment doesn't mean a darn thing when your counsel doesn't do his job. And this attorney had the tools to get us an important concession that would have made the outcome a lot different here. So I ask the Court to reverse my client's conviction. All right. Thank you. Case just arguably submitted. And for the day, we'll be in recess.
judges: Tg Nelson, Hawkins, Zilly